**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ROBERTS CHEVROLET GMC, INC.<br>d/b/a Thomasville Chevrolet GMC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26- (_____) |

**DECLARATION OF MARK KARBINER IN SUPPORT OF THE**
**DEBTOR'S PETITION AND FIRST DAY MOTIONS**

I, Mark Karbiner, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am a Managing Director at J.S. Held LLC and Chief Restructuring Officer of Roberts Chevrolet GMC, Inc., d/b/a Thomasville Chevrolet GMC (the "**Debtor**").

2.    I am a Certified Turnaround Professional and seasoned business executive with over 20 years of experience providing financial advisory, business reorganization, and restructuring services to companies in a variety of industries. I regularly advise middle market companies on a wide range of transactions, including mergers and acquisitions, plans of reorganization, and financial restructurings, as well as the private placement of debt and equity. I have also served as Chief Restructuring Officer, Chief Financial Officer, and Financial Advisor for a variety of public and privately held middle market companies. Throughout my career, I have worked with more than 145 middle-market companies with an aggregate enterprise value of more than $3.5 billion and completed over 35 M&A and restructuring transactions across a broad spectrum of industries.

---

[1]  The last four digits of the Debtor's federal tax identification number are 4114.  The Debtor's address is 34460 Highway 43, Thomasville, AL 36784.

3.      On April 24, 2026, the Debtor retained J.S. Held LLC to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and assist with contingency preparations for a potential chapter 11 filing.

4.      As Chief Restructuring Office, I have become familiar with and knowledgeable about the Debtor's day-to-day operations, business and financial affairs, as well as the circumstances leading to the commencement of this Chapter 11 Case (the "**Chapter 11 Case**"). Except as otherwise indicated herein, the facts set forth in this Declaration (the **"Declaration"**) are based upon my personal knowledge, my review of relevant documents, information provided to me by team, employees of the Debtor, the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

5.      On the date hereof (the "**Petition Date**"), the Debtor commenced with the United States Bankruptcy Court for the District of Delaware (the "**Court**") this Chapter 11 Case by filing a voluntary petition (the "**Petition**") for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      I submit this Declaration to assist the Court and parties in interest in understanding the Debtor's prepetition business operations, the circumstances compelling the commencement of this Chapter 11 Case, and the Debtor's goals for this Chapter 11 Case, and in support of the Debtor's (i) Petition and (ii) the first day motions (the "**First Day Motions**") filed with this Court concurrently herewith.

7.    This Declaration is organized into three parts. Part I provides an introduction to and of the Debtor and its Chapter 11 Case.  Part II describes in more detail the Debtor's corporate structure, business, prepetition capital structure, the developments that led to the Debtor's chapter 11 filing, and the Debtor's goals in this Chapter 11 Case. Part III sets forth the relief requested by the various First Day Motions and the facts supporting such relief.

## I.    INTRODUCTION

8.    Since October 2023, the Debtor has operated an authorized Chevrolet and GMC automobile dealership in Thomasville, Alabama. However, because of various prepetition events, the Debtor finds itself burdened with liabilities that render its business, in its current state, no longer viable and that deprive the Debtor of the liquidity necessary to operate its business in the immediate and longer-term periods.

9.    Prior to the commencement of this Chapter 11 Case, the Debtor undertook a series of deliberate and comprehensive measures intended to stabilize operations, improve financial performance, and preserve enterprise value as a going concern including, but not limited to the implementation of new management, operational restructuring initiatives, and engagement of professional financial advisors to pursue a sale of the business as a going concern.

10.    The Debtor intends to utilize this Chapter 11 Case to pursue a court-supervised sale of its business as a going concern. The Debtor believes pursuing a court-supervised sale process represents the most viable path to maximizing value for its stakeholders.

## II.    THE DEBTOR'S BACKGROUND

### A.  General Background on the Debtor's Business

11.    Since October 2023, the Debtor has operated an authorized Chevrolet and GMC automobile dealership in Thomasville, Alabama. The Debtor's business consists primarily of the

retail sale of new and used Chevrolet and GMC vehicles, together with the related financing, warranty, and service offerings.

12.     The Debtor is permitted to engage in the business of selling and servicing of Chevrolet and GMC vehicles, as an authorized dealer, pursuant to that certain Chevrolet Dealer Sales and Service Agreement with General Motors LLC, dated October 22, 2025, and that certain GMC Dealer Sales and Service Agreement with General Motors LLC, dated October 22, 2025 (collectively, the "**Franchise Agreement**"). The Franchise Agreement governs the Debtor's business relationship with General Motors LLC.

13.     Since January 28, 2026, the Debtor has been operating its business under the d/b/a name Thomasville Chevrolet GMC. Prior to January 28, 2026, the Debtor operated its business under the name Roberts Chevrolet GMC.

**B.  The Debtor's Corporate Structure**

14.     The Debtor is a Delaware corporation whose sole shareholder, Motors Holding LLC, holds 34,620 preferred shares and 8,000 common shares of the Debtor, representing 100% of the Debtor's share capital.

15.     Motors Holding LLC owns 100% of the total equity interests in the Debtor.

16.     The Debtor's current operational management consists of Clark Wekenman as President, and Ronald McCants as Secretary and Treasurer of the Debtor.

17.     Prior to Clark Wekenman's appointment as President of the Debtor, Susanty Roberts served as President of the Debtor from October 2023 until November 2025, and Tracy Arrington served as Secretary and Treasurer of the Debtor during that period.

## C. The Debtor's Capital Structure

18. On or about September 2023, Debtor entered into that certain Master Loan Agreement with AmeriCredit Financial Services, Inc. (the "**Floor Plan Agreement**"). The Floorplan Agreement operates as a revolving line of credit. The Debtor may request advances for the Debtor to acquire certain vehicles and AmeriCredit Financial Services, Inc., by its sole discretion, may advance the Debtor funds under the Floorplan Agreement. Advancements under the Floorplan Agreement constitute the agreement's principal and are payable upon 5 days written demand prior to an event of default, and immediately on demand after an event of default has occurred. The Floorplan Agreement's aggregate credit limit is $5,500,000 with new and used vehicle sub limits of $4,500,000 and $1,000,000, respectively. Interest accrues under the Floorplan Agreement at a variable rate interest structure based on the Prime rate. The Debtor's obligations pursuant to the Floor Plam Agreement is secured by all the Debtor's assets, now owned or hereafter acquired, and is perfected by, among other things, UCC-1 financing statements filed with the Delaware Department of State on or about August 28, 2023 against all asset of the Debtor.

19. On or about November 2025, Debtor entered into that certain Note Payable Agreement with General Motors LLC (the "**GM Note**"). The amount of principal outstanding pursuant to the GM Note is $2,500,000.

20. During the two-month period encompassing September and October 2025, the Debtor's then-President Susanty Roberts, caused the Debtor to become a party to no less than 7 merchant cash advance agreements (each an "**MCA Agreement**") with certain merchant cash advance lenders (the "**MCA Lenders**"). The Debtor does not have copies of all these various MCA Agreements, but the ones uncovered thus far by the Debtor appear to be styled as a sale of future receipts, and purport to grant security interests in the Debtor's accounts and proceeds thereof to

secure the cash advances. While two of the MCA Lenders under their respective MCA Agreement have filed UCC-1 financing statements to perfect any security interest putatively granted by the MCA Agreements, they have done so with the Alabama Secretary of State not the Delaware Secretary of State as required by statute.

21.    Additionally, five of the MCA Lenders have not themselves filed UCC-1 financing statements to perfect any security interest putatively granted by their respective MCA Agreement, instead four separate sets of UCC-1 financing statements were filed by "CT Corporation System, as Representative," for undisclosed principals, and one UCC-1 financing statement was filed by "First Corporate Solutions, as Representative" for an undisclosed principal, who may be the various MCA Lenders under the MCA Agreements. Furthermore, only one of these five separate sets of UCC-1 financing statements was filed with the Delaware Secretary of State as required by statute while the other four were filed with the Alabama Secretary of State.

22.    Finally, the Debtor will be seeking the approval of a debtor in possession facility in the amount of $1,500,000, to be provided by General Motors LLC. (the "DIP Loan")  Of the $1,500,000, General Motors has already funded $300,000 as a bridge loan for the purpose of allowing the Debtor to file this case.   That $300,000 will be sought to be approved as part of the DIP Loan as a roll up (the "Roll Up").

**D.  Events Leading to the Commencement of the Chapter 11 Case**

23.    Since its inception, the Debtor's business has maintained an established presence in its market area and generated substantial gross revenue through the sale of new and used vehicles, financing activities, warranties, and related automotive services.

24.    While the Debtor's sales activity and gross receipts frequently reflected apparent operational profitability on paper, the Debtor's business nevertheless experienced significant and

6

progressive financial deterioration as a direct result of prolonged and substantial operational and financial mismanagement occurring over an extended period time, from approximately October 2023 through October 2025.

25.     During that period, Debtor's prior management failed to maintain adequate internal accounting controls, cash management procedures, inventory oversight, expense monitoring, and vendor payment practices necessary for the sound operation of a dealership of this size and complexity. Ordinary-course obligations to floorplan lenders, parts suppliers, repair vendors, auction houses, transportation providers, payroll-related entities, taxing authorities, and other trade creditors were not timely satisfied despite continuing business operations and ongoing revenue generation. Vendor obligations were routinely deferred, accounts payable materially increased, and creditor relationships significantly deteriorated.

26.     In addition, the Debtor's prior management decisions and activities (i.e., failure to properly process payoffs of customer's vehicles, incomplete title work, and lack of properly trained technicians to service vehicles), caused several local vendors, banks, and customers to became disillusioned with the level of service provided by the Debtor.  All of this contributed to a "bad reputation" within the small community.

27.     At the same time, the Debtor's prior management increasingly relied upon short-term and high-cost financing arrangements, including multiple merchant cash advance loans, to address mounting liquidity shortfalls and operational cash-flow deficiencies. These financing arrangements imposed extraordinarily burdensome repayment obligations, which substantially impaired the Debtor's ability to maintain sufficient working capital for ongoing operations. Rather than resolving the underlying financial instability, the Debtor's prior management repeatedly

resorted to such financing mechanisms and compounded the Debtor's liquidity crisis and accelerated the depletion of operational cash resources.

28.  Despite these mounting challenges, the Debtor continued to operate and generate sales activity, demonstrating that the underlying business retained substantial going-concern value and market viability when appropriately managed.

29.  Beginning in November 2025, the Debtor undertook a series of deliberate and comprehensive measures intended to stabilize operations, improve financial performance, and preserve enterprise value as a going concern including the appointment of new management with substantial experience in automotive retail operations, financial restructuring, and operational efficiency.

30.  The Debtor's new management assumed operational control of the Debtor's business and immediately undertook substantial corrective and rehabilitative measures. Under new management, the Debtor has been able to implement and enhance accounting and reporting procedures, strengthen internal financial controls, review and reduce unnecessary operating expenses, improve inventory oversight, and initiate efforts to restore relationships with key vendors, lenders, and industry partners. The Debtor has also undertaken efforts to address aged accounts payable obligations, improve operational transparency, and stabilize day-to-day operations.

31.  Under the new management, the Debtor has also focused on restoring its business reputation in the community by implementing several community outreach initiatives, including a monthly appreciation event, sponsorship of local youth sports, and recognition of schoolteachers. In fact, the Debtor's employees had already felt the impact of the community's improved

perception, and a "team" culture has been established to help employees value one another and improve the level of customer service delivered.

32.     Concurrently with its efforts to stabilize and improve operations, the Debtor retained financial advisors to evaluate strategic alternatives and explore a potential sale of the business as a going concern. In consultation with its advisors, the Debtor undertook efforts to assess market interest, identify prospective buyers, and evaluate the feasibility of a transaction that would maximize enterprise value while preserving ongoing operations. Prior to the Petition Date, the Debtor received interest from multiple potential buyers. The level of interest received has reinforced Debtor's belief that its business retains substantial underlying value notwithstanding the financial distress caused by prior mismanagement and accumulated legacy liabilities. In particular, the Debtor is presently engaged in negotiations with a prospective buyer concerning the potential acquisition of the Debtor's business pursuant to a stalking horse transaction structure in this Chapter 11 Case.

33.     The Debtor would have preferred to continue pursuing and negotiating a going-concern sale outside of bankruptcy, however, notwithstanding the operational improvements achieved under new management and the ongoing sale discussions with interested parties, the Debtor has exhausted available liquidity and no longer possesses sufficient working capital or financial runway to continue operating and pursuing a sale process absent the protections of the Bankruptcy Code. The continuing burden of legacy liabilities, mounting creditor pressure, and repayment demands from lenders has created immediate liquidity constraints that threaten the Debtor's ability to maintain ordinary-course operations.

### E. Objectives for the Chapter 11 Case

34.     Through this Chapter 11 Case, the Debtor seeks to accomplish several critical objectives designed to preserve and maximize the value of its business for the benefit of all stakeholders as well as maintain ordinary-course business operations (thus preserving its existing workforce, retaining customer goodwill, and continuing to service its customers) while restructuring efforts and the court supervised sale proceeds.

35.     As previously mentioned, the Debtor is finalizing negotiations with a potential buyer, who would serve as a stalking horse bidder in a court supervised sale. The sale to a stalking horse bidder would be subject to higher and better offers pursuant to court-approved bidding procedures that the Debtor intends to propose shortly after the Petition Date.

### III.     The First Day Motions[2]

36.     As noted above, concurrently with filing of this Chapter 11 Case, the Debtor filed various First Day Motions requesting relief necessary or appropriate to effectuate the Debtor's entry into and continued operations under Chapter 11 of the Bankruptcy Code. The Debtor anticipates that the Court will conduct a hearing within a few business days after the commencement of this Chapter 11 Case, during which the Court will consider the First Day Motions.

37.     Generally, the First Day Motions have been designed to meet the immediate goals of (i) establishing procedures for the efficient administration of these Chapter 11 Cases; (ii) continuing the Debtor's operations during this Chapter 11 Case with as little disruption and loss of productivity as possible; and (iii) maintaining the confidence and support of the Debtor's key constituencies.  I have reviewed each of the First Day Motions, including the exhibits, attached

---

[2] Capitalized terms used in describing the First Day Motions but not otherwise defined herein have the meaning ascribed to them in the applicable First Day Motions.

thereto, and believe the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in this Chapter 11 Case.

38.     A summary of the relief requested and the facts supporting each of the First Day Motions follows:

**A.  Insurance Motion**

39.     The Debtor maintains various insurance programs providing coverage for, among other things, general liability, workers' compensation liability, and employers' liability (collectively, the "**Insurance Programs**"). The Insurance Programs include coverage primarily from the insurance policies listed on <u>Exhibit C</u> to the Insurance Motion (the "**Insurance Policies**"), which Debtor has obtained through third-party insurance carriers (the "**Insurance Carriers**").

40.     The Debtor seeks entry of an order authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and (b) pay all prepetition obligations in respect thereof, including administrative fees (collectively, the "**Insurance Obligations**") in the ordinary course of business and pay prepetition obligations in respect thereof.

**B.  Cash Management Motion**

41.     In the ordinary course of its business, the Debtor manages its cash, receivables, and payables through a cash management system (the "**Cash Management System**").  The Cash Management System is designed to efficiently collect, transfer, and disburse funds. The principal components of the Cash Management System are (i) the Debtor's bank account with Cadence Bank and (ii) controls and processes associated with the Debtor's cash management procedures.

42.     The Debtor maintains accounting controls in connection with its Cash Management System and is able to accurately trace the funds flowing through the Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  As a result, the Debtor is able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

43.     As of the Petition Date, the Debtor maintains one (1) bank account with Cadence Bank, account number ending in 1583, which is owned by the Debtor (the "**Cadence Bank Account**"). The Cadence Bank Account serves as the main operating account for paying items including payroll, operating fees, bank fees, insurance and taxes. All funds received in the ordinary course by the Debtor are deposited into the Cadence Bank Account.

44.     By this Motion, the Debtor seeks entry of an order, (i)(a) authorizing it to continue and maintain its existing cash management system, (b) continue and maintain its existing bank account, and (b) use existing business forms; (ii) waiving the requirements of Bankruptcy Code section 345(b); and (iii) granting related relief.  In accordance with the foregoing, the Debtor requests that its bank be authorized and directed to receive, honor, and pay any and all checks, wire transfers, and other instructions, and drafts payable through, drawn, or directed on the bank account after the Petition Date.

### C.  Wage Motion

45.     The Debtor has 28 full-time employees and 1 part-time employee (collectively, the "**Employees**").

46.     <u>Wages</u>. Before the Petition Date and in the ordinary course of business, the Debtor typically paid Employee Compensation Obligations (excluding commissions) on a bi-weekly

basis. The Debtor typically paid commissions to eligible Employees on a monthly basis. The Debtor processes payroll through a third-party, Paychex, Inc.

47.     The Debtor estimates that, as of the Petition Date, it has approximately $59,086.76 outstanding in total accrued Prepetition Employee Obligations, all of which will become due and owing before the final hearing on this Wage Motion.  As of the Petition Date, the Debtor is unaware of any employees who individually are owed wages greater than the $17,150.00 cap established by section 507(a)(4) of the Bankruptcy Code.

48.     <u>Leave Policies</u>. The Debtor offers its Employees other forms of compensation, including paid time off for vacation days and holidays. These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary, and necessary for the Debtor to retain qualified employees to operate its business. Failure to provide these benefits could contravene applicable law and harm employee morale and encourage the premature departure of employees. The Debtor therefore requests authority to continue these programs in the ordinary course of business during this Chapter 11 Case.

49.     <u>Vacation Days</u>. Prior to the Petition Date, the Debtor offered its employees the following:

| After completing the first year of employment. | Awarded 64 hours of vacation benefits on the Anniversary of Hire Date. |
|---|---|
| After completing the second year of employment and every year of continuous employment thereafter. | Awarded 112 hours of vacation benefits on the Anniversary of Hire Date. |

50.     <u>Holiday Pay</u>. The Debtor provides paid time off for the following holidays: New Year's Day, Memorial Day, Independence Day, Thanksgiving Day, and Christmas Day.

51.     <u>Health and Welfare Benefits</u>. The Debtor offers its Employees various health and

welfare benefits, including (1) medical, dental, and vision insurance through insurer Blue Cross Blue Shield of Alabama and (2) life insurance through insurer Global Life.

52.     Historically, the Debtor remits approximately $12,500 monthly to insurer Blue Cross Blue Shield of Alabama to cover Employees' medical, dental and vision insurance benefits. Debtor is responsible for approximately 50% of the monthly premium paid to Blue Cross Blue Shield of Alabama, while the remaining 50% of the monthly premium is covered by participating Employees through bi-weekly Deductions. The Debtor remits approximately $1,000 monthly to insurer Global Life to cover Employees' life insurance benefit. Participating Employees are responsible for 100% of the monthly premium paid to Global Life, which is remitted by participating Employees through bi-weekly Deductions.

53.     By this Wage Motion, the Debtor seeks entry of an order, authorizing but not directing the Debtor, in its discretion, as deemed necessary to continue to operate and preserve value, to (i) pay Employee Compensation Obligations (as defined in the Wage Motion) and Employee Benefit Obligations (as defined in the Wage Motion); (ii) pay Payroll Deduction Obligations (as defined in the Wage Motion);  and (iii) honor and continue the Debtor's prepetition programs, policies, and practices as described in the Wage Motion with respect to the Prepetition Employee Obligations in the ordinary course of business.

**D.  Utility Motion**

54.     Several Utilities provide the Debtor with utility services, such as electricity, water, internet, telephone and communications, and other similar services that are necessary for the continued operation of the Debtor's day-to-day affairs. Uninterrupted utility service is critical to the Debtor's ability to operate its business and maximize value for the benefit of its creditors.  The Debtor cannot operate its business without utility service. Should any Utility refuse or discontinue

14

service, the Debtor would be forced to cease or limit its operations. Such a cessation would substantially disrupt the Debtor's operations and result in revenue loss, which could irreparably harm and jeopardize the Debtor's business.

55.     The proposed Adequate Assurance Deposits listed on Exhibit A to the Utility Motion, represents an amount equal to approximately two weeks' payment for utility services provided by Utilities, calculated by Debtor using the available historical payment information prior to the Petition Date, are sufficient adequate assurance of the Debtor's future payments to the Utility providers.  As set forth in Exhibit A to the Utility Motion, the proposed Adequate Assurance Deposits total $4,208.

56.     For the foregoing reasons, it is in the best interests of the Debtor, its estates, its creditors, and all other parties in interest that the Court grant the relief requested in the Utility Motion.

**E.  Tax Motion**

57.     By this Tax Motion, the Debtor requests that the Court enter an order, (i) authorizing, but not directing, the Debtor to pay certain prepetition taxes, assessments, fees, and other charges in the ordinary course of business, including any such taxes, assessments, fees, and charges subsequently determined upon audit, or otherwise, to be owed (collectively, the "**Taxes and Fees**") as the Debtor, in its sole discretion, deems necessary, (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing, and (iii) granting related relief.

58.     In the ordinary course of business, the Debtor collects, withholds, or incurs an assortment of Taxes and Fees that it then remits to various federal, state, and local taxing, licensing, regulatory and other governmental authorities (the "**Taxing Authorities**"). The Taxes and Fees

include (i) Sales and Use Taxes, (ii) Real and Personal Property Taxes, (iii) Income and Franchise Taxes, (iv) Business License and Regulatory Fees, and (v) Other Taxes and Fees (excluding all tax-related Withholdings and Employer Taxes).

59.     The Debtor estimates that, as of the Petition Date, it has accrued approximately $49,000 in prepetition Taxes and Fees, all of which remains outstanding. Accordingly, to the extent necessary, the Debtor seeks authority to remit, in its sole discretion, payment on account of any outstanding Taxes and Fees due or that may become due in the ordinary course of business and to continue remitting, in its sole discretion, Taxes and Fees in the ordinary course of business on a postpetition basis.

## F.  The DIP Motion

60.     The Debtor immediately needs to obtain postpetition financing in order to pay its employees and continue its business operations. Without access to debtor-in-possession financing, the Debtor has limited cash on hand, and does not expect to be able to generate sufficient levels of cash flow through operations of the Debtor's business to cover cash needs through the sale process. Furthermore, the agreement of certain of the Debtor's prepetition lender to use of cash collateral is premised upon approval of the proposed DIP Documents.

61.     As it became apparent that the Debtor were facing a liquidity situation, the Debtor examined a variety of options for resolving their liquidity issues without resorting to a chapter 11 filing. This process took many months. The Debtor explored raising capital and selling the company outside of bankruptcy, but neither of these proved feasible. Debtor also examined other sources of debt financing, but since virtually all of the Debtor's assets are pledged to their various prepetition lenders, therefore Debtor understood that new debt from outside sources would be unlikely.

62. As a result, the Debtor asked its existing lender General Motors LLC ("GM") to provide funding to provide the financing necessary for the expenses of the Chapter 11 Cases and for operations during the Chapter 11 Case.

63. Negotiations with GM were conducted in good faith and GM agreed to provide funding in the amount of $1,500,000 on a super priority basis, with an exceptionally low interest rate of 6%. Without the proposed financing as set forth in the DIP Loan, the Debtor would not have sufficient funds to preserve their assets through the sale process, thereby being forced to liquidate at a less than optimal recovery. Therefore, the DIP Loan is in the best interests of the Debtor, its estate, and all constituencies, and that without it, the Debtor would have been forced to liquidate.

64. As noted, the negotiation of the DIP Loan was in good faith with both parties being represented by experienced, independent bankruptcy counsel. The negotiations involved several rounds of give-and-take.

65. One critical term of the DIP Loan was an initial pre-petition tranche payment of $300,000 (the "Roll Up"). The $300,000 payment was made by GM to the Debtor solely for items relating to the filing of this case: attorney retainer, financial advisor retainer and director and officer insurance premiums. Without the Roll Up, the Debtor would have been unable to proceed with filing this case.

66. In my experience, the Debtor would not be able to obtain unsecured financing (including financing based just on an administrative or superpriority claim) or secured financing junior or *pari passu* to existing liens of the pre-petition lenders. The Debtor has a limited set of unencumbered assets to offer a debtor-in-possession lender, therefore its existing lender was the only party willing to provide a DIP in this case.

17

67.    The DIP Facility will be used to cover the costs associated with preserving the Debtor's operations and running these Chapter 11 Cases through to a sale of the company. I have been closely involved in preparing the budget on which the DIP Loan is based, and I believe that if the Interim Order is entered promptly, followed by the Final Order, the Debtor will have sufficient funds to operate through the sale to the benefit of all of its constituencies.

68.    The DIP Facility represents the best source of financing available to the Debtor under the circumstances, and was negotiated in good faith with the prepetition lenders, resulting in terms that the Debtor submits are reasonable and appropriate to meet the Debtor's financing needs during this Chapter 11 Case. I do not believe that the Debtors can obtain credit on more favorable terms than those offered by GM under the DIP loan. Accordingly, the relief requested in the DIP Motion should be granted as it is in the best interests of the Debtor, its estate, its creditors, and all parties in interest.

69.    Several of the First Day Motions request authority to pay certain prepetition claims. I understand from my advisors that in chapter 11 matters, the Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days of the bankruptcy case "except to the extent relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  In light of Bankruptcy Rule 6003, the Debtor has narrowly tailored its requests for immediate authority to pay certain prepetition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its bankruptcy estate.  Other relief will be deferred for consideration at a later hearing.

70.    I have consulted with my colleagues, as well as with the Debtor's professional advisors, regarding the relief requested in the First Day Motions, and understand each of the First

Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated into this Declaration by reference.

71.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is (a) necessary to enable the Debtor to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) critical to the Debtor achieving a successful restructuring; and (c) in the best interest of the Debtor's estate and its stakeholders. I believe that, if the Court does not grant the relief requested by the Debtor in the First Day Motions, the Debtor's business and its estate will very likely suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

*(Signature page to follow)*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 22, 2026

Mark Karbiner
Chief Restructuring Officer